**In re VERMONT FIBERGLASS, INC. d/b/a Pettit Pools of Rutland, Debtor.**

**Bankruptcy No. 83-155.**

United States Bankruptcy Court, D. Vermont.

Nov. 21, 1984.

---

Robert I. Tepper, Rutland, Vt., for First Vermont Bank & Trust Co.

Mark Butterfield, Rutland, Vt., for debtor.

David D. Robinson, Rutland, Vt., trustee.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

On August 5, 1983, Vermont Fiberglass, Inc. (Fiberglass), a Vermont Corporation whose principal business is the manufacture of swimming pools and spa equipment, filed a petition under chapter 11 of the Bankruptcy Code (Code) in order to rehabilitate as an ongoing business. The case was converted to a chapter 7 liquidation on March 8, 1984, 38 B.R. 151 (Bankr.). April 27, 1984 the First Vermont Bank & Trust Company (Bank), a secured creditor in this proceeding, filed a motion for relief from the automatic stay of Code section 362(a). A hearing, after notice, was held on August 4, 1984. The parties submitted memoranda of law in September and October 1984. From the records in the case and the testimony adduced at the hearing, facts as set forth herein were established.

## FACTS

Fiberglass is the successor-in-interest to Brown, Goodrich & Orr, Inc. (BGO).

In 1974 a Vermont corporation known as Pettit Brothers, Inc. (Pettit Brothers) purchased a parcel of land (real estate) and mortgaged the same to the Bank. The mortgage was duly recorded. In 1976 Pettit Brothers executed a promissory note in favor of the Bank in the amount of $86,000 in consideration of a loan of equal amount expressly secured by the real estate.

In 1978 BGO bought the real estate from Pettit Brothers and mortgaged the same to Pettit Brothers in consideration of a loan in the principal amount of $284,000. The mortgage was duly recorded.

Also in 1978 Pettit Brothers and BGO joined in executing in favor of the Bank a "Subordination Agreement and Assignment" drafted by the Bank, which document recites that (a) BGO is indebted to Pettit Brothers as "evidenced by a promissory note and secured by a security agreement;" (b) for valuable consideration (as between BGO and the Bank, a loan in the principal amount of $146,000) Pettit Brothers "sells, assigns, sets over, mortgages and conveys" to the Bank the 1978 indebtedness of BGO to Pettit Brothers "and all of the property securing the same;" (c) BGO's 1978 indebtedness to Pettit Brothers "is hereby subordinated to any and all indebtedness, absolute or contingent, present or future, several or otherwise" of BGO to the Bank; (d) "any collateral or other security ... which said Bank may hold, or which may come into its possession, may be released or otherwise dealt with by said Bank;" and (e) "the possession by said Bank of any promissory note or other commercial paper, or other evidence of indebtedness ... shall be conclusive that it is a part of the indebtedness covered hereby." The document is not notarized, was not recorded, and does not refer to or incorporate by reference the BGO-Pettit Brothers mortgage. Curiously, with respect to this transaction, the Bank did not require (1) delivery of the promissory note BGO executed in favor of Pettit Brothers in connection with the BGO-Pettit Brothers mortgage or (2) tender to it of payments under the BGO-Pettit Brothers note. In fact Pettit Brothers kept possession of the note, BGO made payments to Pettit Brothers under the note, and Pettit Brothers made no payments to the Bank in keeping with the Bank's request to merely be kept informed as to whether BGO kept payments current.

In addition to the 1974 and 1978 mortgages, the 1976 note, and the 1978 Security Agreement and Assignment, the following documents are in evidence:

(a) a 1978 security agreement executed by BGO in favor of the Bank in consideration for a loan in the principal amount of $146,000, evidenced by a promissory note, and financing statements with respect thereto, signed by the debtor. The financing statements were duly filed in May 1978.

(b) a 1978 security agreement executed by BGO in favor of Pettit Brothers in consideration of a loan in the principal amount of $284,000, and financing statements with respect thereto, signed by the debtor. Recorded with the Rutland City Clerk in May 1978, the security agreement recites that it "is subordinate to a promissory note and security agreement from [BGO] to [the Bank] in the amount of [$146,000] and is also subject to a subordination agreement between [Pettit Brothers] and [the Bank]". Duly filed in May 1978, the financing statements recite: "This lien is expressly subordinate to a lien of [the Bank], of record."

(c) a 1979 security agreement executed by BGO in favor of the Bank, referencing the 1978 BGO-Bank $146,000 note, and financing statements with respect thereto, referencing the 1978 BGO-Bank financing statements executed in connection with the $146,000 note. Filed with the Rutland City Clerk and the Secretary of State in 1979, each 1979 financing statement is marked "AMENDMENT," recites additional and further collateral not covered by the referenced financing statements, and is not executed by the debtor.

(d) two 1979 security agreements executed in favor of the Bank in consideration of a loan in the principal amount of $200,-000, evidenced by a promissory note. The security agreements reference the 1978 BGO-Pettit Brothers security agreement and financing statements. Pettit Brothers joined in executing each of these two 1979 BGO-Bank security agreements for the purpose of acknowledging that its 1978 security agreement and accompanying financing statements are to be subordinated to "BGO's line of credit in the amount of $200,000 and this security agreement."

(e) a 1980 security agreement executed by Fiberglass in favor of the Bank in consideration of a loan in the principal amount of $15,460, and accompanying U.C.C. statements. Filed with the Rutland City Clerk and the Secretary of State in 1980, each filed U.C.C. statement (1) references the 1978 BGO-Bank financing statements, (2) is marked "AMENDMENT" and "Continuation," and (3) recites additional and further collateral not covered by the referenced financing statements.

(f) a 1980 security agreement executed by Fiberglass in favor of the Bank in consideration of a loan in the principal amount of $245,000, evidenced by a promissory note. The note appears to be a rewrite of, *inter alia*, the 1979 $200,000 note and the 1980 $15,460 note.

(g) a 1981 security agreement executed by Fiberglass in favor of the Bank in consideration of a loan in the principal amount of $165,000.

Each filed financing statement shows on its face that the relevant security interest attaches to proceeds of collateral. No security agreement was filed with respect to any transaction, with the exception of the 1978 BGO-Pettit Brothers security agreement.

## DISCUSSION

In broad terms, the issue is the extent to which the Bank's security interests are enforceable against the collateral.

AS TO LAPSED FINANCING STATEMENTS:

■■■ Where a secured creditor allows a perfected security interest to lapse, the trustee may avoid the security interest to protect unsecured creditors. *See, Matter. of Vintero Corp.,* 735 F.2d 740 (2d Cir. 1984). In this regard, Vermont Statutes, Title 9A, section 9–403(2) provides that

a filed financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses upon the expiration of the five year period unless a continuation statement is filed prior to the lapse ... Upon lapse the security interest becomes unperfected ...

The financing statements executed in favor of Pettit Brothers were filed in May 1978. These financing statements lapsed in May 1983 for the reason that no continuation statement with respect thereto was filed. Under the statute, the BGO-Pettit Brothers security interest is unperfected. The result is that the bankruptcy trustee as lien creditor may avoid the unperfected security interest. *See* Code § 544.

## AS TO CONTINUATION STATEMENTS:

 A continuation statement may only be employed to continue the subject matter of the original financing statement, and, conversely, additional collateral may not be described in the continuation statement. *In re Merrill,* 29 B.R. 531, 35 U.C. C.Rep.Serv.1976 (Bankr.D.Me.1983). A continuation statement cannot be used as a device to add collateral. Atty.Gen.Op., 27 U.C.C.Rep.Serv. 594 (Ky.1978). Thus, a continuation statement may be effective to extend the duration of a financing statement, but is not effective to give notice of a security interest in additional and further collateral not described in the underlying financing statement. In the instant case, the filed statements marked "Continuation" purport to add additional and further collateral to the subject matter of the underlying financing statements. To the extent that such filed statements purport to perfect a security interest in such identified further and additional collateral, the filed statements are without legal effect.

 A continuation statement is timely filed when it is filed not sooner than six months prior to the expiration of the underlying financing statement. 9A Vt.Stat. § 9–403(3); *see, In re Callahan Motors, Inc.,* 396 F.Supp. 785 (D.N.J.1975); *In re Davidson,* 29 B.R. 987, 989 (Bankr.W.D. Mo.1983). A continuation statement filed before six months prior to the expiration of the original financing statement is of no effect. Atty.Gen.Op., 14 U.C.C.Rep.Serv. 860, 863 (Ohio 1974). The policy reason is that a creditor should not be required to search the records before the beginning of the proper period for the filing of a continuation statement. *Chrysler Credit Corp.* *v. United States,* 24 U.C.C.Rep.Serv. 794, 795, 796 (E.D.Va.1978); Atty.Gen.Op., 12 U.C.C.Rep.Serv. 1251, 1252 (Iowa 1973). Thus, a continuation statement must be timely filed to continue the effectiveness of the original financing statement. Atty. Gen.Op., 22 U.C.C.Rep.Serv. 266, 268 (N.C. 1977). The dictate of the statute is mandatory, now permissive. *In re Callahan Motors Inc., supra,* 17 U.C.C.Rep.Serv. at 276; Iowa Atty.Gen.Op., *supra,* 12 U.C.C.Rep. Serv. at 1252. Under the statute, the filing of the instant continuation statements was not timely. Therefore, the filing may not be given legal effect. The result is that the underlying financing statements, filed in May 1978, lapsed in May 1983. In consequence, the security interests incident to the BGO-Bank 1978 financing statements are unperfected; as such, the security interests may be avoided by the bankruptcy trustee. *See* Code § 544.

## AS TO AMENDED FINANCING STATEMENT:

 An amendment does not extend the period of effectiveness of a financing statement. 9A Vt.Stat. § 9–402(2). Under the statute, the filed U.C.C. statements marked "AMENDMENT" were ineffective to continue the duration of the underlying financing statements.

 A financing statement may be amended by filing a writing signed by both the debtor and the secured party. *Id.* § 9–402(4). For the reason that the filed U.C.C. statements marked "AMENDMENT" were not signed by the debtor, the filing of such statements was devoid of legal effect. On this basis the Bank's security interest in the additional and further collateral described in such statements was not perfected by the filing of such statements. The result is that the bankruptcy trustee as lien creditor may avoid the unperfected security interests. *See* Code § 544.

## AS TO PERSONAL PROPERTY:

 In that no continuation statement or amending statement herein is to be

given effect, and that the underlying original financing statements lapsed before the commencement of this proceeding, the strong-arm clause of Code section 544 enables the trustee to avoid the security interests of the Bank in the personal property of Fiberglass. The result is that the Bank has no security interest in personal property that is enforceable against the bankruptcy estate. That Pettit Brothers recorded the 1978 security agreement in the Rutland City land records does not change this result. Although a copy of a security agreement may be sufficient as a financing statement, *see* 9A Vt.Stat. § 9–402(1), the filing of such a document cannot occasion perfection of the security interest unless it is duly filed in the U.C.C. records, *see* 9A Vt.Stat. § 9–403, and in the appropriate locations, see Id. § 9–401. In the instant case, the filing did not cause to be perfected any interest in personal property for the reason that the document was not duly filed in the U.C.C. records (it was filed in the City land records). As previously noted, the accompanying financing statements have lapsed.

AS TO REAL ESTATE ASSIGNMENT:

■■■■■ "Land" or "real estate" includes all rights thereto or interests therein. 1 Vt.Stat. § 132. Undeniably, a mortgagee's interest in real estate is an interest within the purview of the statute. A conveyance of a mortgagee's interest in real estate must be signed by the grantor and by two or more witness and acknowledged by the grantor before a town clerk, notary public, master, county clerk, judge or register of probate and recorded at length in the clerk's office of the town in which the real estate is located. *See* 27 Vt.Stat. § 341. An assignment of a mortgagee's interest is a conveyance within the purview of the Statute. *Passumpsic Savings Bank v. Buck,* 71 Vt. 190, 44 At. 93 (1898); *Ladd v. Campbell,* 56 Vt. 529, 89 A.L.R. 126 (1884). An assignment of a mortgagee's interest is not effectual against any person but the grantor and his heirs, unless the conveyance is acknowledged and recorded. *See* 27 Vt.Stat. § 342, *Ladd v. Campbell, su-*

*pra* (unrecorded mortgage assignment not effectual against *bona fide* purchaser). In the instant case, the bankruptcy trustee is neither the grantor, nor an heir of the grantor, of the relevant interest in real estate. Without more, the 1978 "Security Agreement and Assignment" does not bind the trustee, to the extent that such agreement purportedly assigns to the Bank the mortgagee's interest of Pettit Brothers. Further, the Bank never recorded the "Security Agreement and Assignment." Under Vermont law, the rights of the holder of an unrecorded interest in real estate are inferior to the rights of a *bona fide* purchaser of the unrecorded interest who perfects first. In the instant case, the rights of the Bank as the holder, under the BGO-Pettit Brothers mortgage, of an unrecorded mortgagee's interest in the real estate are inferior to the rights of the trustee who under Code section 544 obtained on bankruptcy day the status of a perfected *bona fide* purchaser of the unrecorded interest. Section 544 provides:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor ... that is voidable by ... a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

The effect of the section in this case is that to protect the unsecured creditors the trustee is entitled to avoid the 1978 agreement to the extent that it purports to assign to the Bank the 1978 BGO-Pettit Brothers mortgage lien. In consequence, the Bank may not enforce the instant mortgagee's interest against the real estate.

AS TO AUTOMATIC PRESERVATION OF LIENS FOR UNSECURED CREDITORS:

■■■■ Any transfer avoided under Code section 544 is preserved for the benefit of

the estate but only with respect to property of the estate. Code § 551. Under section 551 the trustee succeeds to such rights as he may· defeat in the hands of the transferee of an avoided transfer. *See* House Report No. 595, 95th Cong., 1st Sess. 376 (1977) and 124 Cong.Rec.H 11,097 (daily ed. Sept. 28, 1978); Senate Report No. 989, 98th Cong., 2d Sess. 91 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. With respect to the pending matter, the instant mortgagee's interest inures to the benefit of the estate for the reason that the transfer of such interest may be avoided by the trustee. In sum, all such amounts as purportedly were secured by the GBO-Pettit Brothers mortgage are not secured thereby, with the result that such amounts may constitute an unsecured claim against the estate. Such claim would comprise the aggregate amount owing by BGO to the Bank allowable as an unsecured claim under Code section 502.

## AS TO PERSONAL PROPERTY TAXES:

██ The trustee does not dispute that $97,893.29 is owed to the Bank as a secured claim under the 1976 Pettit Brothers-Bank mortgage. This amount includes $16,704.55 of real estate taxes under the 1976 mortgage, and water costs. The Bank claims as secured debt a further amount of $18,054.81 in taxes paid by the Bank on property of Fiberglass. The trustee does not dispute that such further sum was expended by the Bank; rather, the trustee argues that the sum represents taxes paid on the personal property, and not on the real property, of Fiberglass. If the further sum consists of charges as to the real estate, it is properly includable as secured debt under the terms of the 1976 mortgage. If the sum comprises a charge on personal property, it is not to be included in the Bank's secured claim, for the reason that the only perfected security interest in the case is the mortgagee's interest under the 1976 mortgage, and the 1976 mortgage does not contain language susceptible of interpretation as authorizing the security interest to encompass personal property

taxes paid. In pertinent part the 1976 mortgage provides that

[Fiberglass] ... shall ... pay all water rents, sewer rents, taxes, lease land rentals and assessments upon [the real estate] .... And in case of failure ... to pay such water rents, sewer rents, taxes, lease land rentals, or assessments ... [the Bank] shall have the right ... to pay such water rents, sewer rents, taxes, lease land rentals and assessments ... adding the proper expense thereof, with interest, to the sum(s) secured ...

This language does not bring taxes paid on personal property within the purview of the security interest granted.

To be entitled to add the further sum of $18,054.81 to the mortgage debt, the Bank must establish that such sum represents taxes paid on real property. The operative principle is that the claimant must prove his case. In the instant matter, the Bank has put on no evidence and made no case for the inclusion of the further sum in the 1976 mortgage debt. The Bank took the position that the sum of $18,054.81 was secured under the various BGO-Bank security agreements in the case. Because the security interests under the BGO-Bank security agreements are unperfected interests, the indebtedness under the various notes accompanying the unperfected security interests are unsecured debts giving rise to unsecured claims. Thus, the amount of $18,054.81 may constitute an unsecured claim; in any event, the Bank did not establish that such amount is secured debt. In sum, the secured claim established by the Bank is $97,893.29.

## AS TO RELIEF FROM STAY:

The trustee has sold ·all the property of Fiberglass since the filing of the instant motion, with security interests attaching to the proceeds of sale. The only perfected security interest held by the Bank is the 1976 mortgage. The secured debt under this mortgage, as established on the instant motion, is $97,893.29 plus interest. On October 31, 1984, the court on motion of the Bank ordered the trustee "to distribute to the First Vermont Bank & Trust Company

the sum of $97,893.29 if such sums are available for distribution according to the priority of said creditor." In that an order for distribution of the same sum was issued, the Bank is not entitled to any additional payment, there is no basis for further relief.

## INCORPORATION BY REFERENCE

To the extent that facts in the foregoing discussion are not recited separately in the statement of facts *supra*, such facts are incorporated in such statement by this reference.

### ORDER

On the foregoing,

IT IS ORDERED that

(1) the First Vermont Bank & Trust Company is entitled to $97,893.29 to the extent such sum is payable to the Bank under the order of October 31, 1984;

(2) the trustee is entitled to proceeds of sale in excess of $97,893.29; and

(3) the motion of the First Vermont Bank & Trust Company for relief from stay is DENIED.